## JOE OXSHEER v. THE STATE.

### No. 1538.   Decided December 22, 1897.

**1.  Assault with Intent to Rape—Indictment—Duplicity.**

An indictment for assault with intent to rape is not duplicitous because it closed
with the expression, "by then and there, without the consent of the said Mrs. L.,
attempting, by force, threats, and fraud, to have carnal knowledge of her, the said
Mrs. L."

**2.  Evidence.**

On a trial for assault with intent to rape, it was not error to permit the prose-
cutrix to testify that before she got to the negro who attacked her, she saw him
standing by, on the inside of the fence, and that he was stooping down as though
at work on the fence.

**3.  Witness—Competency—Nature and Obligations of an Oath.**

Where a boy twelve years old did not know what an oath was, or that there was
any punishment for perjury, but knew the difference in a truth and a lie, had heard
that there was such a place as hell and heaven, and that one who swore lies would
go to hell, he guessed; and that he did not want to go to hell, and would tell the
truth; Held, the court did not err in permitting him to testify.

**4.  Evidence—Identity of Defendant.**

On a trial for assault with intent to rape, where the prosecutrix had testified
that her assailant was a negro, but she was subsequently unable to identify defend-
ant as the negro, Held, it was irrelevant and inadmissible to prove by the sheriff
that search had been made in the county for a strange negro and no such negro could
be found; and to further permit another witness to testify that he was acquainted
with all the negroes in the town of S., and that strange negroes usually stopped at
his house; that he knew of no strange negro in the county at the time, and none
such had stopped at his house, there being no proof that her assailant was a strange
negro in the town or county, and no proof that defendant was a strange negro.

**5.  Cross-examination of Witness.**

Where the State was permitted to prove that a witness had become responsible
for defendant's fee to the attorneys representing him, on cross-examination, he should
have been permitted to state why he so became responsible.

APPEAL from the District Court of Nolan.   Tried below before Hon.
R. A. RIGLAND, Special Judge.

Appeal from a conviction for assault with intent to rape; penalty, five
years imprisonment in the penitentiary.

The charging part of the indictment reads as follows, viz: "Did then
and there in and upon Mrs. Annie Lloyd, a woman, did make an assault
with the intent then and there to commit the offense of rape upon the said
Mrs. Annie Lloyd, by then and there, without the consent of the said

Mrs. Annie Lloyd, attempting by force, threats, and fraud, to have carnal knowledge of her, the said Mrs. Annie Lloyd."

A motion was made to quash the indictment, "because it seeks to charge, and does charge, in one count, two separate and distinct offenses against defendant, viz.: an assault with intent to rape, and an attempt to rape, wherefore defendant says that said indictment is duplicitous and void," etc.

This motion was overruled by the court.

Mrs. Annie Lloyd, the prosecutrix, testified, in substance, that she lived a few miles out of the town of Sweetwater, and was a canvassing agent for the sale of silverware. That on the 22d of December, 1896, she went to town in a top buggy to get a consignment of the silverware which was at the depot. That she ate dinner while in town, and afterwards went to the depot, got the silverware, and started back home. That as she went to the depot, she saw a man on a sorrel horse, some distance off from the depot, but don't know who he was and did not pay any attention to him. That it was shortly after 12 o'clock when she left the depot. That she started back home on the same route that she came, and was assaulted about a mile and a half from town, and at about 1:30 o'clock p. m., as near as she could guess. That she was assaulted in a lane, on one side of which was a pasture (Mr. Trammel's). That as she was proceeding through the lane she saw a negro standing inside the pasture fence, and a sorrel horse was hitched to the next post below where he stood. That when she first saw the negro he was stooping down inside the fence and seemed to be working at it. He was a low, heavy-set, chunky, black negro; that when she got even, or a litle past the negro, he ran up to the buggy and grabbed at her—she thought he grabbed at her throat. He grabbed her left arm above the hand, and she struck him in the face and breast several times with the stick with which she was driving. That in the struggle the lines were jerked out of her hands; he grabbed at her throat and got hold of her bonnet, broke one of the strings, and it fell to the ground, where it was left. That the negro got hold of the lines and turned the horse into the fence on the opposite side of the lane; that during the time the negro said nothing, but was making a grunting kind of noise, and was sorter between the wheels, holding to the buggy. That she began whipping the horse, and he rushed forward towards and into a wire fence. That after she had gotten some little distance from him, she reached down, secured the lines, and drove on to Mr. Carraway's, and Mrs. Carraway got into the buggy with her and they went back and got her bonnet, and then drove back to town, where she immediately reported the affair to the officers. She testified, further, that defendant had been brought before her twice for identification; the first time was on the same evening, after the assault, and that she did not identify him on either occasion. That she could not say now, and would not undertake to say, that the defendant was the negro who had assaulted her, but that he was about the build and color of the one that did assault her. That about two weeks ago a sorrel horse was also brought

to and shown to her, but that this horse looked darker than the one the negro had that assaulted her, and that she could not identify the horse.

Ernest Johnson testified, in substance: That he was 12 years old, and lived at Mr. Jim Trammel's, where he had been living for sometime. The witness being tested by the court as to his competency as a witness, said: "I do not know what an oath is; I do not know what they do with one who swears lies; I do not know that there is any penalty or punishment by law against false swearing, and do not know what they will do with me if I swear falsely in this case. I know right from wrong; I know the difference between the truth and a story. I have heard that there is such a place as heaven and hell. One who swears lies will go to hell, I guess, and that it is wrong to tell lies. I do not want to go to hell and do want to go to heaven, and will tell the truth." The witness being held competent by the court, was allowed to testify, over defendant's objections. He testified, that on the evening of the assault on Mrs. Lloyd, that defendant, who also lived at Mr. Trammel's, said he was going over to the pasture to fix two gaps over there. That defendant took a horse out of the lot, and he saw him ride off into the pasture. That he was gone about twenty minutes. When he came back he pulled off his boots and put on his shoes and shaved. That at supper defendant asked witness not to say anything about his being over in the pasture that evening, but that witness was to tell that he (defendant) was not out in the pasture; and said he would whip him if he told a lie on him. The witness admitted that he had told different statements to Mr. and Mrs. Jim Trammel about the matter, because he was afraid that Joe Oxsheer, the defendant, would whip him. That defendant had whipped him several tims, but that he did not hate defendant enough to swear a lie against him.

P. M. Hall, the sheriff, testified that he got to the place where the assault was alleged to have taken place about an hour and a half thereafter, and saw the evidences of the scuffle which had taken place; saw foot tracks on the ground in the lane. That he saw tracks leading in and out of the pasture, and in the pasture he saw horse tracks which led off in the direction of the Trammel house, and he traced these tracks, which he thought were the same, up to near Trammel's lot. That he took Mrs. Lloyd over to Trammel's, called the defendant out for her to look at, and that she could not identify him. Witness said he noticed a scratched or torn place on the right side of defendant's nose, just above the lip, at that time. He stated that he offered twenty dollars reward for the arrest of the party committing the assault, and sent out searching parties. That he also went out into the country to search for the assailant; but that neither he nor any of the other parties found or heard of any strange negro in the country.

On cross-examination, he stated that he could not say that the horse tracks that he followed from the pasture to Trammel's house were the same tracks that he saw at the place of the assault, but they were very similar and fresh. There was nothing peculiar about the horse track, except that it seemed to be whittled off at the toe, and that he did not ex-

amine Mr. Trammel's sorrel horse to see how his feet looked. The witness also testified, that at the time he called defendant out for the purpose of identification by Mrs. Lloyd, he saw nothing strange about defendant's appearance, nor did he seem excited or in any manner scared.

Buck Johnson, a negro, testified for the State: "I am acquainted with all the negroes around the town; I saw no strange negro in this county at the time of this assault; no strange negro in town. Strange negroes usually stop at my house when they come into the town."

J. P. Trammel and his wife, Mrs. Mattie Trammel, swore to facts directly contradicting the boy witness Ernest Johnson, and established an alibi for defendant. And Jim Polk and Walter Trammel also testified to facts which tended to contradict the witness Ernest Johnson.

There was other testimony, but it is unnecessary to detail it, as the above statements contain the material testimony in the case.

*Beall & Beall,* for appellant.—The court erred in overruling defendant's motion to quash the indictment, and an indictment which charges two separate and distinct offenses in one count is duplicitous and void. The indictment in this case charaged, in one count, the offense of an assault with intent to commit rape and the offense of an attempt to rape. Whart. Crim. Pl. and Prac., sec. 243; Nicholas v. State, 23 Texas Crim. App., 317; Heinman v. State, 22 Texas Crim. App., 44; Hickman v. State, 22 Texas Crim. App., 441; Wandell v. State, 25 S. W. Rep., 27; Melton v. State, 24 Texas Crim. App., 284; Reagan v. State, 28 Texas Crim. App., 227; Melton v. State, 23 Texas Crim. App., 204; Burney v. State, 21 Texas Crim. App., 565; Taylor v. State, 22 Texas Crim. App., 529.

The court erred in permitting the witness Mrs. Annie Lloyd to testify to her conclusions as to what the negro was doing at or to the fence, and as to his intention at the time he attacked her. Conclusions and opinions can not be testified to by a witness, but the witness must testify to facts, leaving the jury to draw their own conclusions. McGee v. State, 21 Texas Crim. App., 670; Whart. Crim. Ev., sec. 456; Cooper v. State, 23 Texas, 331; Campbell v. State, 10 Texas Crim. App., 560; Lumbkin v. State, 12 Texas Crim. App., 341; Koblenschlag v. State, 23 Texas Crim. App., 264; Irvine v. State, 26 Texas Crim. App., 37.

The court erred in permitting the negro boy Ernest Johnson to testify upon the trial of this cause. A witness should not be permitted to testify upon the stand unless it clearly appears that he possesses sufficient intellect to correctly relate transactions with respect to which he is interrogated, and understand the obligation of an oath. This witness was a negro boy 12 years old, but too ignorant to know what an oath was or that there was any punishment for perjury, nor what would be done with him for swearing falsely. The court permitted him to testify. Upon the witness stating, in answer to the court's questions, that he knew the difference in a truth and a lie, that he had heard there was such a place as hell and heaven, and that one who swore lies would go to hell, he

guessed, and that he did not want to go to hell, and would tell the truth. It is true that in the admission of such evidence it is left largely to the discretion of the court, but in this instance that discretion has unquestionably been most severely abused. Penal Code, art. 768, sec. 2; Williams v. State, 12 Texas Crim. App. 127; Holst v. State, 23 Texas Crim. App., 1; Taylor v. State, 22 Texas Crim. App., 529.

The court erred in permitting the witness P. M. Hall to testify upon the trial of said cause, that he offered $20 reward for the arrest of the assailant; that parties had gone out to search for the negro, and that he nor any of them could hear of any strange negro in the country at the time. .Incompetent and irrelevant testimony is not admissible, and where such testimony is calculated to injure or prejudice the rights of defendant it is a reversible error to admit same. Hearsay evidence is not admissible to prove any facts in a felony case.

Upon the trial of this cause the State, for the purpose of proving the identity of defendant as the person who committed the crime charged, undertook to prove by the witness P. M. Hall that no strange negro was in the country at the time of the assault, and elicited from the witness the evidence complained of in this assignment as set out in defendant's bill of exceptions number 4: That he was the sheriff of Nolan County at the time of the assault, and at the time several parties went out into the country to search for the negro who committed the assault, and that he told them that he would give any man $20 who would catch the negro, upon his identification by Mrs. Lloyd; and that he openly offered a reward of $20 for his arrest, and that he (Hall) also went out into the country in search of the negro, and that he nor any of the other parties found or heard of any strange negro in the country; that there was no result from his or their search. This evidence was objected to by defendant at the time upon the grounds that it was incompetent, irrelevant, and hearsay. 1 Greenl. Ev., secs. 50, 51; Cesure v. State, 1 Texas Crim. App., 19; Whart. on Ev., sec. 264, note 2; Greenl. on Ev., sec. 110; Chumley v. State, 20 Texas Crim. App., 547; Segura v. State, 16 Texas Crim. App., 221.

The court erred in permitting the witness Buck Johnson to testify as to the custom of strange negroes stopping at his house, and as to his not having seen any strange negroes in the county at the time. The evidence of this witness was introduced for the purpose of showing that there was no strange negro in the county that could have committed the crime charged against defendant at the time of its commission, and for the further purpose of showing that none of the negroes in town would commit such an act except defendant. Such testimony should not have been admitted. It could not legally prove or establish the identity of defendant as the person who committed the crme. And can it be urged that the custom of strange negroes when in town, as to calling at witness' house, would prove the fact that a strange negro in the country committing such act would have called at witness' house, and that if he had been in the country this unalterable custom would have brought him to the sight of

this witness? We think not; yet such was evidently its effect before the jury. Take this testimony in connection with that of P. M. Hall, complained of in the fourth assignment of errors, and it would be unreasonable to conclude that the jury who tried this case did not conclude that there was no strange negro in the county at the time of the assault, that the other negroes in town could not have done the deed, and as defendant (a negro) was the only person charged with the assault, that therefore he was the guilty party. Liberty is a pearl of too great price to be jeopardized upon such a class of testimony as this. Vague, shadowy, indefinite, incompetent, and irrelevant, these are its conspicuous elements, yet how deadly its effect when admitted by the court.

The court erred in rendering judgment final on the verdict of the jury and in not setting the verdict and judgment aside, because same are contrary to and unsupported by the evidence, in this: (1.) The defendant was not identified by the assaulted party, and the evidence being circumstantial, is insufficient to establish the identity of defendant, there being positive proof of an alibi. (2.) There is no fact in evidence showing an intention to rape, but to the contrary, in that Mrs. Lloyd was peddling silverware and had just procured a package from the depot. The assault was made on her while on the highway in a buggy near the middle of the day, showing an intent to rob, and not to rape.

In order to sustain a conviction for an assault with intent to commit rape the proof must show that the assault was committed with a specific intent to rape, and the burden of proof to show the criminal intent is upon the State, and evidence showing a mere possibility of the existence of such intent is insufficient. What the intent was can not be definitely arrived at, but we submit that if any intent appears beyond that to make an assault it was intent to rob. The burden is upon the State to prove the specific intent to rape under such charge, and there is absolutely nothing in the entire testimony in this case that could with any possible degree of certainty establish the intent of the assailant in this case to be that of rape. Power v. State, 30 Texas Crim. App., 662; Jones v. State, 18 Texas Crim. App., 485; House v. State, 9 Texas Crim. App., 53; Peterson v. State, 14 Texas Crim. App., 162; Jones v. State, 17 Texas Crim. App., 565.

*Mann Trice*, Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of an assault with intent to rape, and his punishment assessed at confinement in the penitentiary for a term of five years; hence this appeal.

The court properly overruled the appellant's motion to quash the indictment. It charges an assault with intent to rape, and the fact that it closed with the expression, "by then and there, without the consent of the said Mrs. Annie Lloyd, attempting, by force, threats, and fraud, to have carnal knowledge of her, the said Mrs. Annie Lloyd," does not make it duplicitous.

The court did not err in admitting the testimony of Mrs. Lloyd, the prosecutrix, to the effect that she thought appellant was working on the fence. In that connection she stated, according to the explanation of the bill by the court, that appellant was stooping down, as though at work on the fence. Nor was there any error in the court's permitting the witness Ernest Johnson to testify. We think that he manifested sufficient intelligence to understand the nature and obligation of an oath.

Appellant also excepted to the action of the court in permitting evidence by the sheriff that search was made in 'he county for a strange negro, and that no such negro could be found, and also proof by one Buck Johnson that he was acquainted with all the negroes in the town of Sweetwater, and that strange negroes in town usually stopped at his house, and that he knew of no such strange negro in the county at that time, and that none such had stopped at his house. All this testimony was objected to by appellant on the grounds that it was incompetent, irrelevant, and did not prove any issue in the case, and was calculated to prejudice the defendant before the jury, etc. We presume that the theory upon which this testimony was admitted on the part of the State was because the prosecutrix had stated that it was a negro who had committed the rape upon her, and that she was subsequently unable to identify appellant, and it was deemed competent for the State to show that there was no strange negro in the county, and that, therefore, it must have been appellant who committed the assault on the prosecutrix. There is no proof in this record that appellant was a strange negro. So far as we are advised, all the negroes in the county were strange negroes to the prosecutrix; and we fail to see how the fact that the sheriff could find no strange negro in the county at the time or that Buck Johnson had not seen any strange negroes at his house, was competent evidence in this case. Inasmuch as the court admitted this testimony over the defendant's objection, the jury might have been led to believe that this character of negative proof served to fix and identify appellant as the perpetrator of the assault.

We believe that inasmuch as the State was permitted to prove that Jim Trammel, a State's witness, had become responsible for defendant's fee to the attorneys representing him, on cross-examination he should have been permitted to state why he so became responsible. The purpose of the State was, no doubt, to handicap him as a witness, and the defendant had a right to have him make any reasonable explanation. The appellant, in his bill, does not state what he expects to prove by said witness; but the court, in his explanation, states that Trammel told him that he was helping the negro because he had been good to him and his family, and because from what his wife had told him about the matter, he did not believe that defendant was guilty. As the State was permitted to go into this matter, though the answer of the witness merely involved his belief, we think that the defendant was entitled to this evidence.

We do not believe that there is anything in the motion made by defendant to correct the verdict of the jury, and think that the verdict was sufficiently clear and certain. We have examined the record carefully, and, assuming that the identity of the defendant is sufficiently established, it occurs to us that the proof that he had the specific intent to rape is not as clearly made out as it should be. Perhaps, on another trial of this case, this branch of it may be more fully developed.

For the errors discussed the judgment is reversed and the cause remanded.

*Reversed and remanded.*