Harvey Jackson v. the State.

No. 13879.   Delivered January 21, 1931.
Rehearing Denied February 18, 1931.

The opinion states the case.

*George C. Cochran,* of Dallas, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CALHOUN, Judge.—Offense, assault with intent to rape; punishment, confinement in the penitentiary for twenty-five years.

The appellant's first assignment of error complains of the court's action in failing to quash the indictment for the reason that the same does not charge the appellant with any crime. We think the indictment sufficiently charged the appellant with the offense of assault with intent to rape. Branch's Ann. P. C., Sec. 1685, and authorities cited therein. Westerman v. State, 53 Texas Crim. Rep., 111, 111 S. W., 655; Taylor v. State. 44 Texas Crim. Rep., 154, 69 S. W., 149; Oxsheer v. State, 38 Texas Crim. Rep., 499, 43 S. W., 335.

Assignment No. 2 complains of the court's action in overruling appellant's motion for an instructed verdict for the reason that there was no evidence showing an intent on the part of the appellant to commit the offense of rape.

Assignment No. 3 complains of the insufficiency of the evidence to show an intention on the part of the appellant to commit the offense of rape and therefore said conviction should not be sustained.

These two last assignments will be considered together.

On the trial of the case the following facts in brief were shown:

Complaining witness, Tessie Coleman, testified that she was thirty years of age and weighed 78 pounds; that on the night of the 30th of March, 1930, she was living at 5423 Morning Side, which is known as the Vickery-Belmont addition of Dallas; that she was boarding there; that she worked in a drug store and on this particular night she worked until 12:30; that she started home and the street car she went out on was a Vickery street car; that she rode out to the end of the street car line; that the place she lived was four blocks from the end of the car line; that there were only two passengers and herself on the street car, one a white man and the other a negro; that they all got off at the same place, the end of the car line; that as she started up the street she heard a noise behind her, footsteps, and that she thought she heard someone running; that someone overtook her and that she thought they were going to pass her, but instead the person grabbed her; that she knew it was a negro who grabbed her; that she had a purse and some money, but when the negro grabbed her he pulled out a big knife; that she was screaming all the time; that he kept choking her and threw her to the ground and that she said "take my purse and my money, but let me alone"; that he did not say anything but continued to choke her, and then he said G— d— you, I'll kill you if you don't stop screaming." Then he choked her almost down and that she was screaming all the time. She doesn't know what made him quit. She was struggling with him all the time, when he left she jumped up and ran across the street and into a house on the corner of Ridgedale; that she just fell in the door and in a few minutes the ambulance came and got her; that by reason of said assault she was bruised on her eyes and face. Her eyes were very red as a result of being bruised and choked. Her neck was swollen and red. Her throat was swollen and scratched. Her nose was swollen and felt as though it was broken and her mouth was swollen. That from that house she went to she was taken to Baylor Hospital; that she was there four or five days; that she could not see during all that time; that when she ran into the house after the attack, she was blind from blood and could not see when she got to the sanitarium; that when the negro was choking her, she was lying on her back on the ground; that she did not know who it was other than that it was a negro. She said the white man got off of the street car at the time she did and went ahead of her. She walked along behind him until he went into a house. That when he went into the house, she heard the foodsteps behind her; that she could identify the negro that came up behind her. As to how she knew it was the same negro who got off the street car, that negro got off there and was behind her and she heard his footsteps all the time; that the assault lasted only a few minutes and that she was resisting all the time and screaming; that he had a knife in his hand when he started to assault her and that in the struggle she·

knocked the knife out of his hand. She did not know whether or not he picked up the knife when he went off because she was blinded by blood and was stunned; that she resisted him to the best of her ability.

Dr. O. T. Woods, who was called to the Baylor Hospital, testified that he saw Miss Tessie Coleman and that she was injured substantially as the said witness, Miss Coleman, had testified and that he made further examination of the lower part of her body and found at least a dozen scratched marks or lacerations on the under-side of the left leg above the knee.

The witness S. M. Crider testified that he was a conductor on the Dallas Railway Company line; that he recalled the night of the assault very well; that Miss Coleman was on his car that night; that when he got to the end of the line, three passengers were on the car; that he knew who they were; that one of them was the colored man here, the defendant in this case, Harvey Jackson, and there was also a tall slim fellow who lived on the corner of McMillan and Ridgedale. He is here as a witness. That was all that was in the car, just those three passengers. They got off at the end of the line. As Miss Coleman got off I spoke to her and she spoke to me; that he then walked around to put his trolley up; that the car don't turn around, you just change the trolley; that he hesitated a moment to watch Miss Coleman and that the colored fellow walked to the curb, they both were walking towards the same curb and in the same direction; that he then got in his car and started back to town. He positively identified the appellant, Harvey Jackson, as being the one on the car. He stated that the appellant did not appear to be drunk nor insane; that when he last saw Miss Coleman, she was apparently ten or fifteen feet behind the white man and the negro was between him and her. He did not watch over thirty seconds. That the next time he saw the appellant he was at the City Hall, about three o'clock that morning. He was by himself in a cell; that they brought him out and he identified him; that the section out there is very thickly populated until you get to the end of his line. There were no houses along there on Ridgedale for several blocks, just one house on the corner and the rest is vacant; that he never recalled seeing the appellant until that night.

The witness J. W. Fritz testified he was in the detective department of the City of Dallas; that he had been connected with the police department for ten years and had been a detective about seven or eight years; that he had occasion to talk to the appellant, Harvey Jackson, at the City Hall and that he made a voluntary statement, which was reduced to writing; that before he made the statement, he gave the appellant warning; that he read the warning to him at the top of the statement blank a couple of times; that having warned him, he reduced the statement to writing; that the appellant signed the statement; that it must

have been early in the morning that the statement was made; that the statement was witnessed by George Litner, who was known as public defender, and Bill Duncan, also a witness for the State. He then stated that (indicating) in his statement is the signature of the appellant; that is the warning that was given before he made the statement and I read it to him again in the presence of the two witnesses.

The State then introduced in evidence appellant's voluntary statement as follows:

"THE STATE OF TEXAS,
"COUNTY OF DALLAS                    . Date Mar. 29 - 30.
"TO WHOM IT MAY CONCERN:

"After I have been duly warned by J. W. Fritz that I do not have to make any statement at all, and that any statement I make may be used in evidence against me on the trial for the offense concerning which this statement is herein made, I wish to make the following voluntary statement to the aforesaid person:

"My name is Harvey Jackson.

"My address is 5450 McComas Ave. in rear.

"I am 26 years old.

"About eleven o'clock or maybe later tonight I left Henry Stanford's house on Clark St. I caught the Vickery car and rode to Vanderbilt. After I got off of the car I saw a woman get off of the same car at the end of the line. I thought it was my wife as my wife had a black coat and hat. I then started after her and caught her a little ways from where she got off of the car. I hit her two times with my fist before I saw she was a white lady. After I knocked her down and saw she was a white lady I heard some one coming and I ran off and left her.

                                        "(signed) Harvey Jackson

"Witness: Bill Duncan, (address) c/o City Hall
        "George Lintner (address) c/o City Hall."

The witness then stated that he visited the scene at the end of the car line; that he went back there that night; that he found a pocket knife; that there was blood on the blade; that there were puddles of blood on the grass and leaves up there where the lady had been attacked; that he did not see Miss Coleman that night; that he saw her later; that he examined the appellant relative to there being marks or scars on him; that he had scratches on his wrists and arms. They were fresh scratches and bleeding; that these scratches were on his wrists and the back of his hand; that they appeared to be made by a fingernail; that there was no pressure brought to bear on the appellant to make the statement; that he was talking calmly when he made it.

There were one or two other witnesses who lived in the neighborhood where the attack was made who testified that they heard screams about the time of the attack. One of them testified that there was a

steady flow of screams with just slight interruptions. Another witness testified that when he heard the screams, and that when the screams ceased, he saw a form running up the center of the street. J. K. Burton testified that he heard the screams and started to go out and that he heard the screen on the porch open and someone ran against the door; that when he got there, Miss Coleman was on his porch; that she was covered with blood and he could not tell who it was; that he said "What is the matter" and she said "A negro has attacked me." She said he beat her and tried to kill her. When she said that I grabbed her arm and pulled her in and she fell right inside the door. He testified that her eyes blackened up and her face just beat in every way and blood running from her eyes and nose, and I thought from her mouth. That his wife ran to her and grabbed towels and wiped her face off and turned her on her side to keep her from choking to death with the blood; that he called the ambulance and that she was carried away.

W. W. Connor testified that he was employed by the police department and that on that particular night Mr. Hughes was with him; that they were patrolling the streets in an automobile; they saw the defendant, Harvey Jackson; that he was about half a block south of McComas Street on Greenville Avenue when he saw him; that when he saw the appellant, he stopped him and questioned him. He seemed to be a little bit nervous; had blood on his hands and some splotches on his face and that he noticed some on his shoes; that he carried him on down to the drug store and then turned him loose after he made an explanation about the blood. That about forty-five minutes later he arrested the appellant in a servant house on McComas and McMillan Streets; that at the time he took him to the drug store and turned him loose, appellant stated in explanation at that time that two negroes had been fighting on Central Avenue and that he tried to separate them and that was where he got the blood on his face, hands and shoes.

It was also shown by the evidence that the officers picked up at the place of the assault a lady's black close-fitting hat, rather dirty, also a woman's pocketbook.

The appellant offered no testimony and did not testify himself.

The court submitted in his charge to the jury both assault with intent to rape and aggravated assault and there was no exception taken to the charge or to the evidence offered by the State. No motion for a new trial was filed. The issue of whether or not the assault was made with the specific intent to rape to have carnal knowledge of the woman assaulted without her consent by force was fairly submitted to the jury in the Court's charge and the jury having decided said issue against the appellant, we see no reason under the facts in this case to disturb the verdict.

Judgment affirmed. *Affirmed.*

The foregoing opinion of the Commission of Appeals has been exam ined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Solely on the ground that the evidence did not support the judgment, appellant moves for a rehearing. In a written statement made and signed by him shortly after the occurrence, he admitted the assault, but affirmed that he thought the woman in the case was his wife, and that after he had struck her a few blows, upon discovery that she was a white woman, he ran away. The extent as well as the purpose of the assault were fact conclusions placed by statute within the province of the jury and seldom disturbed by us, and then only when we find either no substantial support for the verdict, or else are led to believe it influenced by passion or prejudice. Such is not the case here.

The motion for rehearing will be overruled.

*Overruled.*